Good afternoon. We're here for case number six. This is case numbers 19-2174, 19-2185, and 19-2186, United States v. Daoud. We're going to begin for the appellant, Ms. Alex Oxis, with you. Good afternoon. May it please the court, my name is Georgia Alex-Iquis and I represent the United States. This court should vacate the defendant's sentence as substantively unreasonable. The defendant committed three exceptionally serious offenses in just three years. He participated in a plot to bomb a crowded bar in downtown Chicago. He solicited the murder of an FBI agent. And then he assaulted a fellow inmate, attacking the inmate as he slept, repeatedly stabbing him using makeshift weapons that the defendant had fashioned out of toothbrushes and razors. Defendant's pattern of criminal conduct reflected his steadfast and escalating commitment to violence against innocent people whom he viewed as enemies of Islam. Yet the district court inexplicably stated that it did not see, that it did not view these multiple offenses as being aggravating of one another. And despite a guidelines range of life imprisonment, the district court imposed a sentence of just 16 years. I am puzzled by the emphasis in the government's presentation, both in its brief and now in oral argument, on there being quote aggravating of one another. Why have you emphasized that point? Yes, Judge, for two reasons. One, because the second two offenses are indeed aggravating of the fact that the defendant committed that first offense. Just in and of themselves, that pattern of recidivism demonstrates the substantive unreasonableness of the district court sentence. But also, the fact that the district court dramatically discounted or really disregarded the aggravating aspect of defendant's recidivist pattern, that decision fundamentally undermines other key aspects of the district court's sentencing rationale. So the district courts gave the defendant a substantially below guideline sentence, driven in large part by its characterization of the defendant as awkward and immature, silly, simply doing things, quote, doing what teenage boys do, and that is to talk big and wolf. But the fact that the defendant committed a total of three offenses significantly undercuts this characterization. Planning murders time and again, that's simply not what teenage boys do. And the fact that the defendant planned these two murders with no involvement from the undercover under his purported influence, also contradicts the district court's conclusion that the defendant had somehow been co-opted, those were the district court's words, co-opted into criminal conduct. And the fact that the defendant committed these two additional offenses as he grew older, also contradicts the district court's hopeful idea that the defendant would simply, quote, age out of his criminal conduct. So ultimately, the district court lived with this case for quite a while, and had multiple occasions to observe the defendant, to assess the defendant. And her sentence here really seems driven by what she said, that he was immature, he had bad judgment, he grew up in a tough environment where violence against his religion was often referred to by Americans. Why isn't the district court in a much better position to make that assessment than we are, given the really years that she had to evaluate and assess the defendant in this case? Judge, the government understands that this is a deferential standard of review. And yet at the end of the day, the government firmly believes that in light of the record and in light of the totality of the circumstances, the district court sentenced the defendant based on what the Second Circuit would have called a sterilized account of the record before it. And so it may, it looked to particular factors of the defendant, yes, for example, his age. But it placed so much weight on the idea that an 18-year-old, in and of itself, just being 18, meant that the defendant was so impressionable that he could not fully appreciate the lawfulness of his conduct. And yet, 18 years old is old enough to know that murder, mass murder, is wrong. And these were not impulsive crimes. These are not the kinds of crimes that we would typically say, oh, well, a teenager committed this crime in the heat of the moment because they don't have a full appreciation of their consequences. Each and every one of the offenses that the defendant committed were deliberate, premeditated. They took course over a significant period of time. And the district court's sentencing rationale, despite the years that the case was in front of the district court, the district court's sentencing rationale simply did not appreciate, did not place sufficient weight on 3553A factors that focused on the severity, the cumulative severity of these offenses, the nature and the circumstances of these offenses, and the need to protect the public. I mean, time and again, the district court, even presented with the facts before it, sought to diminish the defendant's culpability for his action. She talked about the fact that the defendant was directed to solicit the murder of an FBI agent by his cellmate, Pascal. And yet the record does not support that idea. The defendant, this was the defendant's idea. The defendant brought it to Pascal. And it made sense that the defendant brought it to Pascal because it was rooted in long-held ideas that the defendant had that he needed to commit violence against enemies of Islam. These were ideas that he had long before the FBI got involved in this investigation. Similarly, the district court mitigated, treated the attack on inmate Hancock as something that was outside of the control of the defendant. She talked about how he was unable to control himself. Yet the full facts that were in front of the district court showed that the defendant, that this attack on Hancock was, again, deliberate, premeditated, and consistent with the defendant's long-held ideas, his commitment to the idea that he needs to commit violence against enemies of Islam, Hancock in particular, because Hancock had drawn an image of the prophet Muhammad. And so the defendant targeted Hancock for that particular reason. He created these makeshift weapons. And he lulled Hancock into believing that the two inmates, these two men who had had a prior history, when the defendant had first assaulted Hancock for this image, the defendant lulled Hancock into believing that the two were friendly again. And then he waited until Hancock was at his most vulnerable, when he was asleep, to attack him. The district court's sentencing rationale places no weight, gives no credence to any of these facts, and instead elevates this idea that the defendant was too young and too impressionable to fully appreciate, again, the unlawfulness of his actions. Ms. Alexakis, part of what we're talking about here is emphasis. How much weight the district court places on certain items, both in the case and with regard to the offender, him or herself? The standard here of substantive unreasonableness, it's a broad term. How do we know that too much emphasis has been placed on one item in the case, or one item of the defendant, versus deferring to someone who sat through, what, four days of the sentencing hearing and took the Alford plea, et cetera? Where do we draw that line as too much? Judge, I really, I think the district court's words speak for themselves. If you look at the sentencing hearing transcript, there's approximately nine pages of typewritten transcript. The vast majority of those pages, at least seven by my count, are dedicated toward mitigating factors for the defendant. So, again, this idea that the defendant is young and impressionable and unable to appreciate the unlawfulness of his conduct. And then a whole slew of other factors that the government discusses at length in its briefs, regarding the pretrial conditions of confinement, the length of the pretrial detention. There's just a number of, the drastic focus of the district court was on those factors. There was very little time spent on the severity of the offense, just acknowledging that the offenses were severe. But does the court need... Go ahead, Judge. Is that correct? That's all she said about the severity of the offense. Judge, I'm sorry. I missed the first part of your question. Referring just to those first couple of lines in the sentencing transcript. Correct. I mean, certainly the court recognized that the offenses were severe. And yet that factor did not carry through in the court's analysis. And so, Judge Brennan, when you ask, you know, where do we draw the line, I think we really, what we're left with are the district court's words here. And, you know, if you place them on a scale, the aggravating factors are simply not, in the government's view, were not given sufficient weight. The severity of the offenses, the nature of the circumstances of each of the offenses, particularly those last two offenses, the pattern of recidivism that the defendant exhibited, the need to protect the public, each and every one of these offenses on its own could have easily warranted a sentence of at least 16 years or approximating 16 years. The fact that the district court imposed a cumulative sentence of 16 years for these three violent premeditated offenses, in the government's view, is substantively unreasonable. The court says at the very beginning of the sentence, the court goes through each of the three crimes and notes the seriousness of each of the three crimes. The attempt was a violent and heinous act to kill or harm others. It clearly deserves possibility of a prolonged sentence. We have said in the past that courts don't have to go into detail on all the 3553A factors. It's clear the court acknowledged it. Why isn't that sufficient here? It's not sufficient, Judge, because after acknowledging those factors, the district court then went on to discount them. To say that the bombing plot, the defendant wasn't fully culpable for it. That the solicitation attempt, the defendant wasn't fully culpable for it. That the attack on inmate Hancock, the defendant could not have been considered fully culpable for it. She talks about how he was unable to control himself again. And so there's this rote acknowledgement of the severity of the offenses. And yet, when you delve into the substance of the district court sentencing rationale, from the government's perspective, that substance simply does not give full treatment, full and proper treatment to evidence in the record establishing the defendant's participation in these offenses and his full culpability for these offenses. And unless there are . . . Do you wish to reserve the remainder of your time, Ms. Alexakis? Yes, please, Judge Brennan. Thank you. Thank you. Mr. Jerkin, we'll move to you. I think you're on mute. Thank you, sir. Thank you. I'm a little awkward with this. May it please the court, if it will. I'm not accustomed to being in this position. I left the U.S. Attorney's Office in 1984, so it's been a long time since I've been in the position of having the standard of review so strongly in my favor. And I have to say it's nice to be back in that position. I think the questions have been right on in terms of exactly what happened. This is a district court judge, a very good district court judge, I might add, who's been on the bench 10 years. She's a former Assistant States Attorney, a former Assistant U.S. Attorney, a former circuit court judge, an appellate court judge in the state of Illinois. And if you read her reasoning, it is incredibly solid. The truth of the matter is, is the government just doesn't like her decision. And that's because the government, only the government, interprets this case the way they do, because they don't want to accept the fact that they set up a young, mentally unstable, we don't have to argue whether he was insane, but the fact of the matter is, this record supports everything Judge Coleman did in terms of what the government calls discounting the seriousness of it. Mr. Durkin, let me ask you a question about that mental illness issue. Sure. Because it's something that is, I think, running around the case, and obviously you were present at the sentencing hearings and you were trial counsel. It seems chronologically, the events occur, of course, in late 2012. This competency issue gets raised somewhere around 2015. Mr. Dawood gets sent to the facility. He's placed on psychotropic medications. Competency is restored. And we get back to a position of 2016. He ends up entering the Alford plea. Is it a defense argument here that the mental illness stretched back, such that it had an impact on responsibility for the crime? Or is it just with regard to his competency during his pretrial detention? I believe there was also, he was sent to the medical facility twice, if I remember correctly. First to Springfield, and then he was brought back. Then he went to Butner. I think that Springfield was 2014, if I'm not mistaken. It's our position, and I think the evidence bears this out, that certainly in the third case, that was affected by his mental illness. And if you look at the report from Butner, it's government exhibit . . . I mean, it's one of our defense exhibits. They find a possibility of schizophrenia, and they specifically find, and this is the doctor at Butner, that he suffered from a mental illness. What we do argue, and that's why I was careful with my words earlier, what I'm arguing is mentally unstable. If you listen to the tapes, and this is what the government cannot accept. The government cannot accept the fact that this kid was goofy, whatever you want to call it. Does it rise to the level of a mental disease or defect in 2012? I don't think so, because he was never examined. He does have a brother, however, who is certifiably schizophrenic. Judge Coleman took that into account. But if you have listened to these tapes that the government claims shows that he wasn't entrapped, and we argue that at least under 3553A, she was . . . the judge was absolutely correct in taking into account the potential of entrapment. Under an Alford plea in particular, this . . . and Judge Coleman points out how inappropriately he would giggle. If you listen to the tapes, he's constantly giggling. At a time when it's supposed to be serious, he's laughing. She points that out. The government doesn't want to accept that. They've never accepted it. But everybody who's reviewed this from the press on says, whoa, what was going on here? And that's what they don't want to accept. Was he mentally, certifiably suffering from a mental disease or defect in 2012? Probably not. Was he unstable? Absolutely. Was he exactly what Judge Coleman called him? Impressionable, young, naive, easily led? Absolutely. And if you listen to those tapes, that's all you need to hear. But that's what the government doesn't want to accept. The government has portrayed this case from the beginning as one of its classic war on terror achievements. And I'm not saying, and I've said this in the arguments, if you look at my argument to Judge Coleman, and I really don't want to argue any of that. I didn't want to argue with Judge Coleman at the time of sentencing, other than the government just kept beating this horse of how awful it was that he was going to blow up a 1,000-pound bomb and he was going to take out a quarter of a city block. And that's what they wanted to do. And yet if you listen to everything going up to that, it's insane to think that this kid had that idea. Even their own agent testified that he did not have a plan to detonate a bomb in Chicago. That was clearly the government. Now, we don't need to debate whether that's a good tactic or a bad tactic. I don't want to get into that. The question is, and it's the same question I asked Judge Coleman, what do we do with a kid that's been an American citizen who was locked up for seven years, who had been restored to good health? What do we do with him? And that's where I think she fashioned an incredibly reasonable and well-documentable decision. Now, going back to the mental health, though, it certainly was an issue in the Hancock attack. And that's another thing the government doesn't want to acknowledge. The record shows that he believed that they'd had a – first they were friends, then there's the cartoon with the prophet, and I don't even want to describe what the cartoon was about. It wouldn't be appropriate in a public setting. But the fact of the matter is they had a fight, and then they got to be friends again. But somehow Dayoud looked out the window of the MCC that night and he saw the majid, the chair from his majid, the mosque, outside his window. And he took that as a message from Allah that that had to be vindicated. So mental disease certainly played a – and that's how he ended up going to Butner. Mr. Durkin, the second crime here involves solicitation for murder of the undercover agent, and that was shortly after he was incarcerated for the attempted bombing or the terrorist activities. There isn't anything in the record at that point saying that he was delusional or having some of the other mental health struggles that he was at the time of the third crime. The court didn't have much to say about that, and the defendant in his elocution certainly didn't express any kind of remorse for that. How can we tell that that crime was appropriately factored into the sentence? Well, I think it was certainly factored into the sentence in terms of – I mean, the judge acknowledged it. But what in the judge's commentary – she acknowledged it at the beginning but didn't give it some of the same attention or address the mitigating factors on that particular crime like she did on some of the others. How can we tell that that one was properly considered? Well, I think if you look at the very beginning of her explanation on page 3 of the transcript, she reviewed – she said she reviewed something the government does in Wyoming now and 17 different items, including all the pleadings and all the exhibits. And included in the exhibits, Judge, are the tape recordings between Paschal and the defendant. The government makes a lot of hay when they say, well, it was the defendant's idea. But the only one who can tell them that it was the defendant's idea was Paschal, who got miraculously let out on bond. He was a classic jailhouse informant. And there was substantial evidence in that record of being pressured by Paschal. They don't start tape recording for a month. And when they say it was his – it was Dayoud's idea, that's all based on Paschal. And, you know, that's a case that I would have been happy to. But she does point out, Judge, if you look at page 9 and – 9 and 10 of the transcript, she talks about as the mental state and the solicitation of the murder, the arguments presented point to the first-time arrestee in prison being placed with the likes of Paschal, a high-ranking, multi-convicted gangbanger. Dayoud was small, who was small in stature, was threatened and called names, and did not obscure their vulgar meaning. Recordings show that Paschal threatened to kick Dayoud's effing, and this wasn't fudge, ass, referred to Dayoud as a homosexual if it was a negative description. He said, yeah, but you don't want to drink or have sex because you're a homosexual, unquote. And there were pages of – pages of this kind of talk, which is why I referred you to what she said she had reviewed before. She read all the government's evidence on that. The government, for better or worse, and I think it helps us, they put all their evidence in as if – all their trial exhibits in here along with all the recordings. And then Judge Coleman says, and there were pages of this kind of talk, including a description that Dayoud, in Paschal's opinion, was all the way fuck crazy. So, I mean, they had some mental health evidence right there from Paschal on the tape recording. You need to be an institution. This is on the tape. The defendant admits, though, to following through on some of the steps that supported his conviction in the sentence for deterrence. As despicable as Paschal is, the need to foster respect for law enforcement is an important goal. Light sentences for any attempt to interfere with it is putting him at risk. Naivety cannot be excused. So, I mean, you know, I think that's a fairly thorough description. And I think the case law is pretty clear that it doesn't have – you don't have to write an appellate opinion for it. I think she did a pretty good job on it. Mr. Durkin, on the issue of the Alford plea, obviously they're rare. We don't see a lot of them. The government objected to the Alford plea. Ultimately, the district court accepted it. Could you speak a little – without getting to any attorney-client privilege communications, of course. Could you speak a little bit to the position of the Alford plea here? I think Mr. Jonas says – I'm on the transcript. This would be docket entry 307, page 403. Sorry, page 43. Mr. Jonas says, and as the government set forth in its response to the defendant's motion, our objection is because the public has to have a belief that the judicial system works, that someone's not pleading guilty just because they feel like the weight of the government is against them. That's not something we'd like to see here. Is that the reasoning behind the Alford plea, or what is the reasoning behind that? No, I'll tell you the reason behind the Alford plea. I wanted to try this case. And the reason behind the Alford plea is this kid changed in front of our eyes. Judge Coleman pointed that out. When he came back from Butner and when he started taking the medication, he was a different person. And he is a truly different person today. He was a different person at the time of the sentencing. And the reason that I suggested the Alford plea at the last minute was that we were fearful that he was going to deconstruct, that the stress of the trial was beginning to upset him. He used to do things. Before he was on medication, he would pace around the room. It drove us crazy. This is, I think, in the record. We would tell this to Judge Coleman. He would start pacing like he couldn't sit still. And he would pace around the cell. And we'd say, Jesus, will you just stop? We've got to talk to you. And he would start circling around the room. I was afraid that was happening again. That's why we did it. And aside from the fact that if anybody realistically thinks they can win a jury trial in this day and age defending a Muslim accused of terror, I'd like to get some advice on how to do that. But it was not because we were afraid of the evidence, Judge. I can tell you that. This was, from a lawyer's standpoint, this was a triable case. There were issues here that could have been litigated. Thank you, Mr. Durkin. Any further questions of Mr. Durkin, Judge Ripple? No, thank you. Judge St. Eve? No, thank you. Thank you. Ms. Alexakos, we'll go back to you for rebuttal. Thank you, Judge. Just a few points. Mr. Durkin emphasized at the outset the standard of review in this case. And, of course, the government recognizes that this is a deferential standard of review. But it cannot be that a district court judge, by virtue of their experience, and admittedly, yes, the judge here is experienced, but it cannot be that as a virtue of their experience that they're insulated from a substantive reasonableness review. Substantive reasonableness must mean something. Otherwise, it would simply be procedural. The only kind of sentencing review that you would have on appeal would be for procedural error. Mr. Durkin stated that he did not believe, or probably not, that the defendant was mentally ill in 2012 when he committed two of these three offenses. The government agrees with that. There's nothing in the record to support that the defendant was mentally ill in 2012. The experts did not diagnose him as being mentally ill in 2012. The characterization of the defendant as mentally unstable is troubling. Because at the end of the day, if he's mentally unstable and in that condition is plotting to bomb downtown Chicago and soliciting the murder of an FBI agent, well, that militates toward a strong need for punishment and incapacitation. That's what he's capable of doing when he's mentally unstable. That's something that the district court should have given greater weight to. In addition, this notion that the defendant is currently on medication and therefore doing better, the portrait that Mr. Durkin is describing of him as fragile, essentially, so fragile that the prospect of a trial could erode any mental health improvements, that also doesn't bode well in terms of the district court's confidence that medication and ongoing treatment would assist the defendant. Once he's outside the structure, the confines of an institutional setting where he has that kind of structure to support his mental health treatment, that's something that the district court should have more strongly considered. And finally, there's discussion about the language or the tone, I'm sorry, the tone that the defendant used in his conversations with the undercover. The fact that he was joyful or giggling, well, the undercover testified at the sentencing hearing that in his experience, that was an indication that someone was, in fact, of a radicalized mindset, that they were excited about the prospect of being able to fulfill their goals. It's also the sign of a dangerous person, someone who's joyful and giggling about the idea of murdering hundreds of people. I mean, that is something else that the district court should have considered and did not give sufficient weight to. And more than the tone are the words, the words the defendant used in his conversations with the undercover, in which he expressed pleasure at the size of the bomb, comfortable with the idea of a thousand people dying, talked about the fact that he felt like he won the lottery through this opportunity to bomb Cactus Bar. And so for all of these reasons, the government would ask that the district court sentence be vacated and that this matter be remanded for resentencing. Thank you, Ms. Alexakis. Judge, could I ask for 30 seconds to bring up one thing that I didn't have time to say? If you do, I will also give Ms. Alexakis 30 seconds as well. Mr. Durkin. I wanted to address the fact that Judge Coleman also imposed 45 years of supervised release. And a very remarkable fact was that she asked us to agree to combat a year before his release, which is something I really think shows how well thought out this sentence is. And there will be a combatting violent extremism condition of his supervised release, and there will be a program for that. And I think that's important for you to consider regarding the reasonableness of this sentence. Thank you, Mr. Durkin. Ms. Alexakis, you are the appellant. You get the last word. Thank you, Judge. Very briefly, because the government has, I believe, fully addressed that point in its briefs. But supervised release is not interchangeable with a prison sentence. The goal of supervised release is rehabilitation. But really what we're talking about here is a disregard for the need for punishment and incapacitation. And this violence extremism counseling program that Mr. Durkin refers to, I mean, the record is clear that while the parties hope that this program will be in place, there's no guarantee that it will be in effect and certainly no guarantee that it will be effective. Thank you. Thank you to both counsel. The case will be taken under advisement. That is our last case for today. The court will be in recess.